# REAL ESTATE PURCHASE AGREEMENT

This REAL ESTATE PURCHASE AGREEMENT (hereinafter referred to as the **"Agreement"**) is made and entered into on March 1, 2019, by and between Lent Christopher Carr (**"Seller"**) and Thomas Jerome Marshall (**"Buyer"**) (Seller and Buyer are each a **"Party"** to this Agreement and are collectively the **"Parties"**).

1. **Purchase Agreement.** Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase from Seller, the property located at 3300 Laurinburg Road, RAEFORD, North Carolina 28376 (the **"Property"**) including all buildings, improvements, and fixtures attached or located on the land other than those excluded herein and subject to all easements, protective covenants, rights-of-way, and mineral rights, if any, according to the terms and conditions contained herein.

2. **Legal Description.** The Property is legally described as follows:

    a. BEGINNING" at an icon stake .in a ditch in the north edge of U. S. Highway 401, Hendrix's corner, and running thence N 12-45 W 350 feet to an iron, at an oak; thence S 84-00 W 424.5 feet to a stake, the northwest corner of Tract No. 1 as shown in Book of Maps 1, Page 129 of the Hoke County Public Registry; thence S 9-15 E 510 feet to a steel blade in the north edge of U. S. Highway 401, McNeill's corner; thence N 62-30 B 475 feet along the north edge of said U. S< Highway 401 to the point of beginning. This description is taken from a map by R. H. Gatlin, Registered Surveyor, dated 10-5-57, and the property herein described contains 4.2 acres. THERE IS EXCEPTED FROM THIS CONVEYANCE THE FOLLOWING TWO TRACTS: * • . -• - - - Tract I: —Ascertain tract or parcel of land in Blue Springs Township, Hoke County, North Carolina, situated about three miles southwest of Raeford, N. C., lying about 75 yards northwest of U. S. Highway 401 near its intersection with State Road No. 1139/ adjoining the lands of John K- McNeill on the west, 3• B. McLeod on the north and Willie Harrell on the east, being further described as follows: Beginning at an iron pipe with two pine pointers, said iron pipe being the northwest corner of the Willie Harrell 4.2 acre tract described in Deed Book 159 at Page 223 in the Hoke County Registry, said beginning point also being a common corner with the John K. McNeill tract described in Deed Book 106 at Page 8 and the J. B* McLeod tract described in Deed Book 145 at Page 984 in the Hoke County Registry? running thence from the beginning as the common line of J- B. McLeod and the aforementioned Willie Harrell 4.2 acre tract, N 82-21 E 150*00 feet toa 5/8 inch iron set in the north line of said Harrell 4.2 acre tract; thence a new line, S 22-22.2 E 254«88 feet to a 5/8 inch iron; thence a new line, S 62-30 w 222.95 feet to a 5/8 inch iron in the west

line of said Harrell 4.2 acre tract; thence as the west line of said 4.2 acre tract, a common line with John K. McNeill, N 08-33 W 322.26 feet to the point of beginningf containing 1.2 acre, more or less, as surveyed by Leland D« Strotherf R. L« S., on November 24r 1982, and being a portion of the Willie Harrell 4*2 acre tract described in Deed Book 159 at Page 223 in the Hoke County Registry. Tract II: A certain tract or parcel of land in Blue Springs Township, Hoke County# North Carolina, situated about three miles southwest of Eaeford/ N. C., fronting on the northwest side of U. S. Highway 401 near its intersection with State Road No. 1139, adjoining the lands of John K, McNeill on the west and Willie Harrell on the east, being further described as follows : Beginning at an iron blade 50^3 feet north of the center line of the pavement of U. S. Highway No. 401, said iron blade being the southwest corner o£ the Willie Harrell 4.2 acre tract described in Deed Book 159 at Page 223 in the Hoke County Registry, said beginning point also being a common corner with John K. McNeill tract described in Deed Book 106 at Page 8 in the Hoke County Registry; running thence from the beginning as the common line of Harrell and McNeill, N 08-33 W 187.64 feet to a 5/8 inch iron set in said conation line of Harrell and McNeill; thence a new line N 62-30 E 222.95 feet to a 5/8 inch iron ; thence a new line S 22-22.2 E 178.18 feet to a 5/8 inch iron set in the south- easst line of the Harrell 4.2 acre tract, said iron being 50.8 feet northwest of the center line of the pavement of U. S. Highway No* 401 ; thence as the southeast line of said Harrell 4.2 acre tract, generally ds the northwest right-of-way line of U. S. Highway No. 401, s 62-30 w 267.95 feet to the beginning, containing 1.0 acre, more or less, as surveyed by Leland D. Strother9 R. L« S., on November 24. 1982, and being a portion of the Willie Harrell 4.2 acre tract described in Deed Book 159 at Page 223 in the Hoke County Registry.

3. **Purchase Price.** The total purchase price for the Property is $568,000.00. Buyer will pay $10,000.00 (the **"Earnest Money"**) upon the execution of this Agreement and then pay the remaining $558,000.00 of the purchase price at closing.

4. **Earnest Money and Other Deposits.** Buyer swears and Seller acknowledges that upon the execution of this Agreement the Earnest Money will be deposited into an **"Escrow Account."** Any and all other deposits made will also be deposited into the Escrow Account. The Earnest Money is nonrefundable unless an exception herein applies.

5. **Closing Date.** Closing will occur on July 5, 2019 (the **"Closing Date"**), at which point Seller will transfer title to the Property to Buyer. However, either Party may unilaterally delay closing for any reason, but in no event will closing occur more than 30 days after the Closing Date specified herein unless both Parties agree to extend the Closing Date in writing. If closing is delayed or extended as permitted by this Agreement, the Closing Date for purposes of this Agreement will be the date on which closing actually occurs.

6. **Delivery of Possession.** On the Closing Date, Seller will deliver possession of the Property to Buyer unless the Parties agree to a different date in writing. Seller will maintain all insurance covering the Property until the Closing Date. Seller agrees to deliver the Property in substantially the same condition as its present state and that Buyer will have the opportunity to inspect the Property prior to the Closing Date. If the Property is not in substantially the same condition as its present state upon delivery, Buyer will have the right to either (a) have the Earnest Money and all other deposits refunded and cancel this Agreement, or (b) accept the Property in such condition and require Seller to pay for the repairs to restore the Property to its former condition. Should Buyer choose this second option, all such repairs must be completed no later than 45 days after the Closing Date, with Seller paying Buyer a $200 penalty for each additional day after the 45-day period that such repairs are not complete.

7. **Closing Costs.** The costs associated with closing this Agreement will be paid as follows:

    a. Seller pays all costs associated with preparation of the deed of the Property; property transfer tax including City and County transfer tax if applicable; for recording any documents related to this sale and ownership change; for half of the escrow fees, if applicable; for any home loans and other debts on the Property not assumed by Buyer including any associated fees; for any judgments, tax liens, or other liens necessary to clear title; and for any recording charges for documents necessary to clear title.

    b. Buyer pays for a title search, a title report, and a property owner's title insurance policy covering the amount of the purchase price; any real estate agent's commission, unless otherwise agreed in writing by the Parties; for half of the escrow fees, if applicable; for the Homeowners' Association transfer fee, if applicable; the lender's title insurance premium, if applicable; for any new home loan charges or assumption of existing loan charges unless otherwise required by the lender; and for any costs associated with financing the purchase of the Property.

    c. Each Party pays for their own notary fee associated with signing this Agreement, if applicable;

    d. Each Party agrees to pay for all other cost associated with closing this Agreement in additional writing, if applicable.

8. **Escrow Account.** A third-party trustee chosen by Buyer will manage the Escrow Account according to the terms of this Agreement. Any procedures followed by the Escrow Account manager must not conflict with the terms herein. The Escrow Account manager is hereby relieved and released of all liability in the event the close of this transaction and/or loan payoff is delayed pending clearance of such funds in accordance with standard banking practices.

9.  **Procedure at Closing.** On the Closing Date, Buyer and Seller, the Escrow Account manager, and any other party required to be present will gather to execute the necessary documents, at which point the Escrow Account manager will distribute the funds in the Escrow Account to the appropriate parties and file the deed to the Property. Closing will not occur if any of the following conditions have not been met:

    a.  The purchase price, closing costs, and all other payments required herein are deposited into the Escrow Account;

    b.  The deed to the Property and any other documentation needed to close the transaction are prepared and delivered to the necessary parties;

    c.  The title company is ready to issue a title policy and, if title defects are preventing the title company from issuing the policy, closing will not occur unless Buyer chooses to waive such title defects in writing;

    d.  Seller has repaired or removed all material defects on the Property prior to the Closing Date unless waived in writing by Buyer;

    e.  All contingencies stated in this Agreement have been satisfied unless waived in writing; or

    f.  All other conditions of closing stated in this Agreement or required by law are satisfied.

10. **Proration.** Taxes, assessments, rents, and Homeowners' Association dues, if any, are to be prorated to Seller up to, but not including, the Closing Date. The Parties will coordinate with each other and the utility companies to ensure all utilities are transferred out of Seller's name and into Buyer's name on the Closing Date, including water, sewer, electric, and gas. Any utilities not transferred on the Closing Date will be prorated according to historical average usage for that month or otherwise according to the prior month's charges.

11. **Title Requirements**

    a.  **Title Report.** Upon executing this Agreement, Seller will order a title report and have it sent to Buyer. Buyer must notify Seller within 10 business days of any objections Buyer has to any existing title defects, including any encumbrance, easement, or other recorded restriction. Upon receiving notice of an objection to a title defect, Seller must cure the defect on or before the Closing Date. Seller may use money deposited from the purchase price to clear any title defect. If Seller fails to cure all defects objected to on or before the Closing Date, Buyer may choose to have the Earnest Money and all other deposits refunded and cancel this Agreement. Alternatively, Buyer may choose to continue the transaction by waiving any title defect in writing.

    b. **Title Insurance.** Buyer agrees to purchase a standard form property owner's title insurance policy covering the amount of the purchase price for Buyer from a certified insurance company. Such policy will insure Buyer against any defect or encumbrance on the title to the Property other than those stated on the deed transferring title to Buyer.

12. **Buyer Contingencies**

    a. **Financing: Third-Party Lender.** Unless waived by Buyer in writing, this Agreement is contingent on Buyer's ability to obtain a financing commitment from an institutional third-party lender on or before July 1, 2019 (the **"Financing Contingency Date"**). The loan must be at the prevailing interest rate, and the loan must finance at least 80% of the purchase price unless Buyer has sufficient funds by the Contingency Date to pay for the portion of the purchase price not being financed by a third-party lender. Buyer will make a good faith effort to secure such financing by the Contingency Date; however, if Buyer is nonetheless unable to secure such financing, this Agreement will be canceled and the Earnest Money and all other deposits will be refunded to the respective Parties.

        i. **Commitment or Denial Statement.** Buyer will provide Seller a copy of a commitment or denial statement from the third-party lender by the Financing Contingency Date. If Buyer does not provide Seller a copy of a commitment or denial statement from the third-party lender by the Financing Contingency Date, this Agreement will be canceled and Buyer will forfeit to Seller the Earnest Money and all other deposits made by Buyer. If Buyer does provide Seller a copy of a denial statement from the third-party lender by the Financing Contingency Date and Buyer so requests, Seller may choose to give written consent to extend the Financing Contingency Date to allow Buyer additional time to secure financing. In this event, if Seller does not then extend financing by the extended Financing Contingency Date this Agreement will be canceled and the Earnest Money and all other deposits will be refunded to the respective Parties.

        ii. **Alternative Financing.** Buyer reserves the right to obtain alternative financing by the Financing Contingency Date, but any alternative financing obtained must not result in any increased costs to Seller.

    b. **Appraisal.** Unless waived by Buyer in writing, this Agreement is contingent on the Property receiving an appraisal for an amount equal to or greater than the purchase price. Buyer will pay for and obtain an appraisal of the Property within 10 business days of this Agreement. If the appraised value of the Property is for less than the purchase price, either Party may choose to renegotiate for a new

purchase price prior to the Closing Date, and, if the Parties are unable to agree on a new purchase price prior to the Closing Date, this Agreement will be canceled and the Earnest Money and all other deposits will be refunded to the respective Parties.

c. **Inspection.** Unless waived by Buyer in writing, this Agreement is contingent on Buyer receiving an inspection report on the condition of the Property from a reputable inspection company. Buyer must pay for and have the inspection completed within 10 business days of this Agreement. If the inspection is not completed within 10 business days of this Agreement, Buyer will be said to have waived this inspection contingency unless the delay is on the part of the inspection company, in which case the inspection must be completed within 15 business days of this Agreement. If the inspection report discovers the existence of a material defect, as defined below, Buyer may choose to either (a) accept the defect and continue with this Agreement, (b) negotiate a reduction of the purchase price, (c) cancel this Agreement and have the Earnest Money and all other deposits refunded to the respective Parties, or (d) request that Seller repair the material defect. If Buyer chooses to negotiate a reduction of the purchase price, the Parties will have 10 business days to reach an agreement, otherwise this Agreement will be canceled and the Earnest Money and all other deposits will be refunded to the respective Parties. If Buyer requests that Seller repair the material defect and Seller fails to repair the material defect within 10 days of Seller receiving notice of it, Buyer may choose to cancel this Agreement and have the Earnest Money and all other deposits refunded to the respective Parties. Seller will pay the cost of any re-inspection to confirm repairs were made.

   i. **Violation of Local Ordinance.** If the inspection report discovers that repairs are required to bring the Property in conformance with any local ordinance and Seller fails to repair the material defect within 10 days of Seller receiving notice of it, Buyer may choose to cancel this Agreement and have the Earnest Money and all other deposits refunded to the respective Parties.

   ii. **Notice of Repairs.** If repairs are requested by Buyer or are required to bring the Property in conformance with any local ordinances, Seller covenants to provide Buyer written notice of any such repairs made to the Property within 5 business days of completing the repairs or by the Closing Date, whichever occurs first.

d. **Waiver of Contingencies.** If Buyer so chooses, Buyer may waive any or all contingencies set forth herein by so stating in a signed writing.

13. **Seller Representations and Warranties**

a. **Marketable Title.** Seller represents that it owns the Property in fee and has the authority and capacity to enter into this Agreement. Seller covenants to convey good and marketable title to the Property by general warranty deed that warrants that the Property is free of all title defects except those stated on the deed and waived by Buyer in writing. The deed will be deposited into the Escrow Account on or before the Closing Date.

b. **Condition of Property.** Unless otherwise agreed in writing, Seller represents and Buyer acknowledges and accepts that the Property is sold (a) "As Is" in the substantially similar physical condition as of the date of this Agreement and (b) subject to all applicable Buyer's inspection, contingency, and due diligence rights herein.

   i. **Material Defect Disclosure.** A "material defect" means any condition existing on the Property that would cost more than $500 to repair or remove or any condition that would have a substantial negative effect on the value of the Property or the health or safety of the occupants, including structural, mechanical, environmental, pest, or other conditions. Unless waived by Buyer in writing, Seller agrees to disclose known material facts and material defects affecting the Property, including known insurance claims within the past 5 years, and make any and all other disclosures required by law within 5 business days of this Agreement. At Buyer's own expense, Buyer has the right to conduct investigations into the disclosed material facts and material defects. Based upon the information discovered from such investigations, Buyer may choose to cancel this Agreement and have the Earnest Money and all other deposits refunded to the respective Parties or request Seller make repairs or take other action.

c. **Violations.** Seller represents that it has not received notice from any government authority regarding any violation of any laws, ordinances, or codes in connection with the condition of the Property. If Seller learns of the existence of any such violation, Seller covenants to immediately notify Buyer.

d. **Encroachments.** With the exception of the following encroachments, Seller has no knowledge of the existence of any improvement encroaching on boundary lines of the Property: _____ By signing this Agreement, Buyer acknowledges that Seller has recommended for Buyer to obtain a survey of the Property at Buyer's expense.

e. **Environmental Threats.** Seller represents that it has no knowledge of any existing or impending environmental threat that poses a substantial risk of significantly diminishing the value of the Property or that would impair Buyer's intended use of the Property such that it would be unconscionable for Seller not to

      disclose it. Examples of such threats include, without limitation, environmental hazards, toxic substances, endangered species, sinkholes, pollution, and pest problems.

   **f.**  **Government Assessments.** Local governments may periodically charge property owners an assessment for improvements that benefit their properties, such as sidewalks or sewers. Seller covenants to pay for any government assessments for municipal improvements completed on or before the Closing Date, and Buyer will pay any assessments for municipal improvements completed thereafter.

   **g.**  **Mechanic's Liens.** Seller covenants to pay off any existing mechanic's liens on the Property on or before the Closing Date and to ensure that any labor or materials furnished between the signing of this Agreement and closing will be paid for in full on or before Closing Date.

   **h.**  **Foreign Investment In Real Property Tax Act (FIRPTA).** Seller represents it is not a foreign person or foreign corporation as defined by the Foreign Investment In Real Property Tax Act (FIRPTA), and, therefore, Buyer will not be required to comply with the withholding requirements of FIRPTA at closing.

   **i.**  **Survival of Warranties.** Seller's warranties in this section will continue through and survive the Closing Date, the completion of this Agreement, and the delivery of the deed and possession of the Property to Buyer.

**14.**  **Seller Disclosures**

   **a.**  **Local and State Ordinances.** Buyer acknowledges and understands that real estate owners are legally required to abide by state and local ordinances and zoning restrictions and that it is Buyer's responsibility to ensure it is acting in compliance with the law regarding this Property.

   **b.**  **Flood Area.** Seller agrees to disclose whether or not the Property is located in a flood area as determined by the pertinent government authority. Buyer acknowledges and understands that the location of rivers, swamps, lakes, and other wetlands, if present nearby, could have a negative impact on the value of the Property or the development of local real estate.

   **c.**  **Radon Gas.** Buyer acknowledges and understands the following:
RADON IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN THIS STATE. ADDITIONAL INFORMATION REGARDING RADON

AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY HEALTH DEPARTMENT.

    d.  **Smoke and Carbon Monoxide Detectors.** Buyer acknowledges and understands that local or state law may require the use of smoke and/or carbon monoxide detectors. If so required by local or state law, Seller agrees to provide Buyer a certificate confirming compliance with local or state smoke and/or carbon monoxide law.

    e.  **Lead Contamination.** Buyer acknowledges and understands the following:
EVERY PURCHASER OF ANY INTEREST IN RESIDENTIAL REAL PROPERTY ON WHICH A RESIDENTIAL DWELLING WAS BUILT PRIOR TO 1978 IS NOTIFIED THAT SUCH PROPERTY MAY PRESENT EXPOSURE TO LEAD FROM LEAD-BASED PAINT THAT MAY PLACE YOUNG CHILDREN AT RISK OF DEVELOPING LEAD POISONING. LEAD POISONING IN YOUNG CHILDREN MAY PRODUCE PERMANENT NEUROLOGICAL DAMAGE, INCLUDING LEARNING DISABILITIES, REDUCED INTELLIGENCE QUOTIENT, BEHAVIORAL PROBLEMS, AND IMPAIRED MEMORY. LEAD POISONING ALSO POSES A PARTICULAR RISK TO PREGNANT WOMEN. SELLER OF ANY INTEREST IN RESIDENTIAL REAL PROPERTY IS REQUIRED TO PROVIDE BUYER WITH ANY INFORMATION ON LEAD-BASED PAINT HAZARDS FROM RISK ASSESSMENTS OR INSPECTIONS IN SELLER'S POSSESSION AND NOTIFY BUYER OF ANY KNOWN LEAD-BASED PAINT HAZARDS. A RISK ASSESSMENT OR INSPECTION FOR POSSIBLE LEAD-BASED PAINT HAZARDS IS RECOMMENDED PRIOR TO PURCHASE.

    f.  **Government Action and Restrictions.** Buyer acknowledges and understands that it is Buyer's sole responsibility to investigate whether any existing, pending, or proposed government legislation, restriction, or action may affect the value of the Property or Buyer's intended use of the Property.

15.  **Release of Dower.** If not already a Party to this Agreement, Seller's spouse, if any, joins in signing this Agreement in order to give his or her consent to the release of any dower or other marital rights in the Property.

16.  **Risk of Loss.** Seller assumes the risk of loss if the Property is destroyed or a material defect or other loss occurs between the date of this Agreement and the Closing Date. If Seller fails to restore the Property to its former condition, Buyer may choose to either (a) cancel this Agreement and have the Earnest Money and all other deposits refunded to the respective Parties, or (b) accept the Property with the loss and require Seller to pay or assign to Buyer any insurance proceeds payable to Seller as a result of such loss.

17. **Cancelation of Agreement.** If this Agreement is canceled as permitted by the terms herein, it will be deemed voided, with both Parties being fully released from performance, and neither Party will have any recourse against the other.

18. **Default and Remedies.** Upon Seller's default of this Agreement, Buyer will be entitled to either (a) cancel this Agreement and have the Earnest Money and all other deposits refunded to the respective Parties, or (b) pursue any remedy available by law or equity, including seeking specific performance. Upon Buyer's default of this Agreement, Seller will be entitled to either (a) cancel this Agreement, keep the Earnest Money as liquidated damages, and have all other deposits returned to the respective Parties, or (b) pursue any remedy available by law or equity, including seeking specific performance. In addition to any other relief that may be awarded, the prevailing Party of any action at law or in equity brought to enforce or interpret this Agreement will be entitled to reasonable attorneys' fees and costs.

19. **Mediation and Arbitration.** All claims or disputes related to the performances or interpretation of this Agreement that the Parties are unable to resolve themselves will be first submitted to a mediation services provider mutually acceptable to both Parties or otherwise through a mediator with the American Arbitration Association. If Parties are unable to resolve the claims or disputes themselves or through mediation, all claims or disputes will be resolved by neutral binding arbitration through an arbitration services provider mutually acceptable to both Parties or otherwise through the American Arbitration Association. Both Parties will share the costs of mediation and arbitration equally.

20. **Deposit Procedure During Disputes.** In the event of a claim or dispute related to the performances or interpretation of this Agreement, the party managing the Escrow Account will either (a) retain all deposits, including the Earnest Money, until the claim or dispute is resolved, (b) release any or all deposits, including the Earnest Money, if the Parties so agree to release the funds by written agreement, or (c) take any other action permitted or required by law or regulation regarding the deposits in the Escrow Account.

21. **Accurate Purchase Price.** The Parties agree that the purchase price paid by Buyer will be an accurate reflection of the true value of the Property at the time of closing. The Parties agree to disclose this to the Internal Revenue Service as required by law.

22. **Further Assurances.** The Parties agree to execute such further documents and do any and all such further things as may be necessary to implement and carry out the intent of this Agreement, including, without limitation, any documents or things that may be required by a third-party lender or title company.

23. **Notices.** Any notice, service of process, or demands required or permitted under this Agreement or under law will be deemed sufficiently given or served if sent by United States certified mail, return receipt requested, addressed as follows:

IF TO SELLER SEND TO: Lent Christopher Carr, 3300 Laurinburg Road, Raeford, North Carolina 28376

IF TO BUYER SEND TO: Thomas Jerome Marshall, 114 King Robinson Drive, Elizabethtown, North Carolina 28377

24. **Miscellaneous Terms**

   a. **Entire Agreement.** This Agreement, including any attachments, addendums, exhibits, and amendments hereto, represents the entire and singular agreement between the Parties with respect to the matters herein stated, and any prior agreements, promises, or representations not included herein are void and of no effect.

   b. **Governing Law.** The Parties agree and acknowledge that all provisions of this Agreement shall be governed by and construed in accordance with the laws of North Carolina exclusively and without reference to principles of conflict of laws.

   c. **Assignment.** This Agreement will be binding and inure to the benefit of the Parties, their personal representatives, successors, guardians, and assigns, but only to the extent that such assignment is permitted by the terms of this Agreement, if at all.

   d. **Survival.** The terms of this Agreement that impose an obligation on either Party after the delivery of the deed to Buyer will continue to survive until satisfied.

   e. **Severability.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, that provision shall be considered removed from this Agreement; however, the remaining provisions shall continue to be valid and enforceable according to the intentions of the Parties. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision will be deemed written, construed, and enforced as so limited.

   f. **Force Majeure.** Neither Party will be liable for any failure or delay in performing an obligation under this Agreement that results from causes or events beyond its reasonable control, including, without limitation, uncontrollable natural forces, war, labor or trade disputes, riots or civil unrest, or government action.

   g. **Joint and Several Liability.** In the event two or more persons or entities are named as one Party to this Agreement, such persons' obligations and responsibilities will be joint and several.

h. **Amendments.** Any amendments, modifications, or additions to this Agreement must be expressly made in a writing signed by all Parties.

i. **Time of Essence.** Time is of the essence for this Agreement.

j. **Construction.** In this Agreement, the masculine, feminine, and neuter genders will be interpreted to include each other, as will the singular and plural. Headings used herein are for convenience only and will not be interpreted to give any meaning to their respective provisions.

k. **Counterparts.** This Agreement may be executed in counterparts, each of which will be deemed an original but considered part of one agreement.

**The Parties have read this entire Agreement and hereby agree to fully perform all the terms and conditions in good faith. By signing this Agreement each Party swears that the information it has provided is true and accurate to the best of its knowledge and belief.**

NOTICE: THIS IS AN IMPORTANT LEGAL DOCUMENT THAT CREATES BINDING OBLIGATIONS. CONSULT AN ATTORNEY IF YOU DO NOT UNDERSTAND THE TERMS OF THIS AGREEMENT.

BUYER

Name: Thomas Jerome Marshall

Sign: _[signature]_ Date: 5/20/19

SELLER

Name: Lent Christopher Carr

Sign: _[signature]_ Date: 5/20/2019

SELLER'S SPOUSE - SPOUSAL ACKNOWLEDGMENT

(If a Seller is an individual with a spouse that is *not also a Seller in this Agreement*, that spouse must sign here. If not, ignore this section.)

By signing below I hereby release any right of dower in the Property subject to this agreement.

Name: DelTarina V Carr

Sign: _[signature]_ Date: 5/20/19

## Witnesses

On this the 20th day of May, 2019, the foregoing instrument was sworn to and acknowledged before me by Thomas Jerome Marshall, Lent Christopher Carr, and Delfarine V Carr, known or proven to me to be the person(s) whose name(s) is/are subscribed to within the instrument. I further swear that I am unrelated to the parties signing this document by blood and hold no interest in the transaction.

FIRST WITNESS

Name: Chad McMillen

Sign: _____ Date: 5/20/19

Address: 1108 Fayetteville Rd.
Raeford, NC 28376

SECOND WITNESS

Name: Michele Hart

Sign: Michele Hart  Date: 5·20·19

Address: 1108 Fayetteville Rd
Raeford, NC 28376

# NOTARY ACKNOWLEDGMENT

## (Seller)

State of  North Carolina
SS.
County of  Hoke

On 5-20-19 (date), before me, Darrall F Murchison (notary), personally appeared **Lent Christopher Carr**, who proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to within the attached REAL ESTATE PURCHASE AGREEMENT, and acknowledged to me that they executed the same in authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Print: Darrall F Murchison       Commission Expires: 9-22-21

Sign: /s/ Darrall F Murchison    [Affix seal]

NOTARY PUBLIC

*[Notary seal: DARRALL F MURCHISON, NOTARY PUBLIC, HOKE COUNTY, NC]*

# NOTARY ACKNOWLEDGMENT

# (Buyer)

State of North Carolina
SS.
County of Hoke

On 5-20-19 (date), before me, Darrall F Murchison (notary), personally appeared **Thomas Jerome Marshall**, who proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to within the attached REAL ESTATE PURCHASE AGREEMENT, and acknowledged to me that they executed the same in authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Print: Darrall F Murchison     Commission Expires: 9-22-21

Sign: Darrall F Murchison     [Affix seal]

NOTARY PUBLIC